UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| HEATHER EIRING o/b/o ) | |
| A.E., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:12 CV 1557 DDN |
| ) | |
| CAROLYN W. COLVIN,[1] ) | |
| Acting Commissioner of Social ) | |
| Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the application of Heather Eiring for supplemental security income (SSI) on behalf of her son, A.E., under Title XVI of the Social Security Act, 42 U.S.C. § 1382. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the court affirms the decision of the Administrative Law Judge (ALJ).

## I. BACKGROUND

Plaintiff A.E. was born in 1997 and was 11 years old at the time of his hearing. His mother filed an application for SSI on his behalf on January 26, 2010. She alleged a September 9, 2005 onset date, asserting disability due to attention deficit hyperactivity disorder (ADHD), depression, anxiety, a sleep disorder, and a speech disorder. (Tr. 121-25.) Plaintiff's claims were denied initially, and after a hearing before an ALJ. (Tr. 61, 11-26.)

---

[1]On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security. The court hereby substitutes Carolyn W. Colvin as defendant in her official capacity. Fed. R. Civ. P. 25(d).

On July 25, 2012, the Appeals Council denied a request for review. (Tr. 1-4.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL AND EDUCATIONAL HISTORY

From 2005 to 2007, plaintiff saw Michael R. Banton, M.D., an adolescent and pediatric psychiatrist, for his ADHD. (Tr. 362-74.) March 8, 2006 progress notes state that plaintiff had made good grades and finished his homework most of the time. His parents reported that he was doing "pretty well." In December, plaintiff reported that he was doing worse in school. The following month, Dr. Banton noted that plaintiff showed improvement. By July 2007 plaintiff was doing "OK" when taking Adderal, used to treat ADHD. (Tr. 368-71.) IQ testing conducted in 2007 showed an IQ score of 77. (Tr. 166, 170.)

On February 23, 2009, plaintiff was seen following a behavioral incident. He had been off his medication for more than one month. (Tr. 268.) On August 27, 2009, plaintiff saw Julianne Matt, M.D., his pediatrician, for a physical exam. He reported struggling with friends, grades, and schoolwork. His ADHD was not under "great control." Dr. Matt prescribed Methylin, used to treat ADHD. Dr. Matt described plaintiff's ADHD as behavioral, characterized by whining, crying, moodiness, temper tantrums, and immaturity for his age. (Tr. 299-301.)

Results from September 23, 2009 Gray Oral Reading Tests 4th Edition (GORT-4) demonstrated an oral reading fluency score of 70, in the poor range compared to same-age peers. (Tr. 178.)

Results from an October 8, 2009 Wechsler Individual Achievement Test-Second Edition (WIAT-II) revealed a Reading Comprehension score of 78, defined as Borderline Delayed range. The examiner wrote that plaintiff "had an extremely difficult time comprehending the stories he read… He just could not remember what he read or interpret it in any way." (Tr. 184-85.)

In October and November 2009, plaintiff's mother reported that plaintiff continued to do poorly and that he was experiencing mood swings and tantrums. During a November 12, 2009 office visit, Dr. Matt reported that although plaintiff acted "very charming" during the visit, he had he had little control over his moods. Dr. Matt believed that plaintiff's predominant problem seemed to be impulse control, although he was now exhibiting violence as a new symptom. Dr. Matt opined that he needed to be evaluated for bipolar disorder, as well as oppositional defiant disorder, a mental disorder of childhood or adolescence marked by a pattern of disobedient, negativistic, and provocative opposition to authority figures. (Tr. 305-06.)

On September 16, 2009, plaintiff received results from the Test of Language Development - Intermediate 4th Edition (TOLD-I:4), indicating that plaintiff exhibited strengths and weaknesses on this assessment. Plaintiff's strengths were Morphological Comprehension and Word Ordering and his weaknesses were Relational Vocabulary, Sentence Combining, and Multiple Meanings. His best composite score was Listening. His most significant area of weakness was Semantics. (Tr. 189-91.)

By October 2009, plaintiff was receiving one hour of special education instruction in math and task completion. He earned mostly C's in school and required extended time on tests, easier assignments, and frequent teacher interaction. (Tr. 171.)

On October 16, 2009, a Clinical Evaluation of Language Fundamentals (CELF-4), used to evaluate language skill deficits, was administered. Plaintiff's core language score of 75 was below the average range for his age. His strengths were formulating sentences and understanding spoken paragraphs, and his weaknesses concerned concepts and following directions, word classes, and word definitions. Plaintiff scored a 3 in concepts and following directions, which was below average. The examiner wrote, "This was one of the most difficult subtests for [plaintiff]. This may indicate difficulty following multi-step directions in the classroom or difficulty with remembering how to complete homework assignments." (Tr. 186-88.)

On October 22, 2009, an Individualized Education Plan (IEP) team reviewed existing data to determine plaintiff's eligibility for Special Education services (SPED). The Team confirmed that plaintiff's most recent IQ score of 77-- from 2007-- was consistent with prior testing and was current enough to forego further testing. Existing data included plaintiff's previous special education case manager's note that plaintiff had a slower rate of learning and that his test results indicated a poor working memory. (Tr. 166.) Plaintiff's IEP team stated:

> [Plaintiff] demonstrates a good work ethic most of the time. He will usually put forth his best effort and try something even if he thinks it is hard. However, once he hits a point of frustration, he shuts down and refuses to continue working. He pouts and pulls his shirt up over his face. He cries and/or whines and says it is too hard. This comes about quickly and suddenly even in a small group or one on one setting. He is impulsive in work completion and spends much time self-correcting in regular and SPED classrooms.
>
> Behaviorally, [Plaintiff] exhibits the same impulsivity and immature frustrations when interacting with his peers. He is not able to demonstrate age appropriate problem solving skills or the ability to control his emotions when he doesn't get his way. He often pouts or shouts in the other students' faces. He also calls the other students names and makes faces at them. When things don't go his way, he will often tattle on his classmates telling the teacher what they did without including what his own wrongdoing was. These behaviors have made it difficult for [Plaintiff] to make new friends here at school. His peers have a hard time playing with him and working with him because he does not react to things in an appropriate manner.

(Tr. 171-72.) That same month, his IEP team reported that plaintiff's cognitive ability was average to low average. (Tr. 166.)

In November 2009, plaintiff saw Krystal Witthaus, LCSW, for increased aggressive and defiant behaviors after his mother had received a note from his teacher stating that plaintiff did not accept responsibility for his behavior and was acting aggressively toward his peers at school. Ms. Witthaus assigned a current global assessment of functioning (GAF) score of 63, indicating variable functioning with sporadic difficulties or symptoms in several

but not all social areas. She diagnosed a mood disorder and ADHD, predominantly the impulsive type. By the end of the month, plaintiff stated that he believed that an increase in his ADHD medication was helping. (Tr. 270-72.)

In 2010, plaintiff began seeing a psychiatrist, Claudia Viamontes, M.D. On January 15, 2010, Dr. Viamontes's wrote that plaintiff's general appearance was guarded and perplexed, his speech was slow, his mood and affect were anxious, and his insight and judgment were limited. (Tr. 273.) Dr. Viamontes assigned a GAF score of 50. In a Mental Residual Functional Capacity (RFC) Questionnaire, Dr. Viamontes indicated that treatment had improved plaintiff's symptoms. She opined that plaintiff had unlimited ability to understand and carry out short and simple instructions, as well as limited but satisfactory ability to remember work-like procedures, maintain attention for two-hour segments, complete a normal school day and school week, perform at a consistent pace, get along with peers, and carry out detailed instructions. (Tr. 287-90.) Throughout 2010, Dr. Viamontes assigned higher GAF scores, and by December 2010, she assigned a GAF score of 65. (Tr. 273-74; 350-54.)

On March 15, 2010, Audrey Schlote, plaintiff's sixth grade teacher, authored a Teacher Questionnaire confirming that plaintiff had an unusual degree of absenteeism due to doctor's appointments and parents reporting sickness or tardiness. She reported that plaintiff read at a fourth grade level and received special education services on a daily basis in math, reading, task completion, and speech. Ms. Schlote reported that plaintiff received one-on-one help and assessed mostly "slight" or "obvious" problems in plaintiff's ability to acquire and use information, and "serious" problems comprehending and doing math problems. Ms. Schlote noted that plaintiff was not very independent and constantly asked for help on work or about routines. She also reported that plaintiff was routinely late or absent, typically two out of every ten days. She reported that his family moved frequently and that they had recently moved here from out of state. (Tr. 149-56.)

5

On March 25, 2010, plaintiff saw Dr. Matt for a cough. Plaintiff's father reported that plaintiff saw a psychiatrist for his ADHD. He also stated that plaintiff performed at grade level, earned A's, B's, and C's, and had no learning disability or special needs. (Tr. 330-31.)

Also on March 25, 2010, Isabel Mora, M.D., a medical consultant with the state agency, completed a Childhood Disability Evaluation Form. She opined that plaintiff had marked limitation in acquiring and using information and less than marked or no limitation in the other five domains of functioning. Dr. Mora noted that plaintiff's mother reported no problems with language function at home. (Tr. 275-80.)

By May 2010, plaintiff's IEP team indicated that plaintiff's behavior had improved. His emotions did not seem to fluctuate as frequently, and the team recommended placement inside a regular class from 40 to 79% of the time. (Tr. 208-19.)

From March 15 to October 18, 2010, plaintiff saw Michael Cundiff, Licensed Professional Counselor, for psychotherapy. Plaintiff was having difficulty in school, showed no respect for others, and did not listen. Notes state that the family moved frequently. His father had recently lost his job, and the family was currently being forced out of their home after losing their lease. Mr. Cundiff assigned a GAF score of 55 and diagnosed ADHD and major depressive disorder (MDD) with features of impulsivity and anxiety. Plaintiff's mother reported that plaintiff's difficulties were more severe than ADHD. Although medication helped control plaintiff's "fits," he still had mood swings and few coping skills. In June, plaintiff's mother reported inappropriate behavior and acting out. Plaintiff reluctantly discussed past sexual abuse by an older cousin. Plaintiff also exhibited "teen rebelliousness." Plaintiff's father reported that he was doing well academically, but still had some social deficits. Mr. Cundiff opined that plaintiff was making slight improvement.

In December 2010, plaintiff's father reported that plaintiff showed oppositional behavior. However, he had also joined the chess club at school, which he enjoyed. (Tr. 355-61, 379.)

Plaintiff saw Dr. Matt in September and October 2010. Plaintiff reported that he had no problems with friends and that he enjoyed sports, despite spending most of his time watching television and playing video games. In October, he was behaving appropriately and had a normal attention span and concentration. (Tr. 324-29, 332-35, 355-61.)

In a November 11, 2010 Teacher Questionnaire, Scott Davis, plaintiff's special education case manager, opined that plaintiff was reading at a second grade level, performing math at a fifth grade level, and performing written language at a fourth grade level. Mr. Scott reported that plaintiff displayed "serious" problems acquiring and using information. He assessed "obvious" to "serious" problems attending and completing tasks, as well as "obvious" to "very serious" problems interacting and relating with others. He believed that plaintiff exhibited paranoid thinking, for example, plaintiff believed that his peers and teachers did not like him. Mr. Scott opined that plaintiff's ADHD directly impaired his academic ability and particularly his peer relations. He reported that plaintiff's grades were improving due to constant attention by his teachers. Mr. Davis believed that plaintiff lacked the social skills to deal with people in social situations and disagreements. He noted that plaintiff spread rumors, was unable to control his anger, feelings, and frustrations, and pouted like a five-year-old. Mr. Scott reported that plaintiff still had verbal disagreements, demonstrated immature behaviors such as whining, pouting, tattling, and chewing on his fingers, and made false complaints that he was not feeling well. Mr. Scott opined that plaintiff's delusional thinking that others were watching and picking on him had intensified. (Tr. 226-33.)

**Testimony at the Hearing**

On February 14, 2011, plaintiff's mother testified to the following at an administrative hearing before an ALJ. Plaintiff, who was in the seventh grade at the time of the hearing, had the maturity level of a 9- or 10-year-old. Plaintiff had never been hospitalized for mental problems, but received treatment from a therapist, as well as a psychiatrist. Medication helped control plaintiff's symptoms somewhat. Plaintiff could read but could not remember what he read. Plaintiff had been held back in kindergarten. He attended remedial classes in the morning at school. Plaintiff had difficulty getting along with others and had received three in-school suspensions since the fall. With the exception of a one-day suspension in the third or fourth grade, plaintiff had never been suspended or expelled from school. Plaintiff received extra help at school, including individual attention and extra time for taking tests. (Tr. 35-51.)

### III. DECISION OF THE ALJ

On February 22, 2011, the ALJ issued an unfavorable decision. (Tr. 11-26.) At Step One, the ALJ found Plaintiff had not performed substantial gainful activity (SGA) since July 26, 2010, his application date. At Step Two, the ALJ determined that plaintiff had the severe impairments of ADHD, depression, anxiety, and a speech disorder. (Tr. 14.) At Step Three, the ALJ determined that plaintiff's impairments did not meet or medically equal a listing. The ALJ next evaluated functional equivalence, finding "marked" limitation in the domain of interacting and relating with others; a less-than-marked limitation in the domains of acquiring and using information, attending and completing tasks, and caring for self; and no limitation in the domains of moving about and manipulating objects and health and physical well-being. (Tr. 16-26.) The ALJ concluded that because plaintiff had only one "marked" area of functioning, his impairments did not functionally equal the severity of the listings. (Tr. 26.) Consequently, the ALJ found that plaintiff was not disabled under the Act. (Id.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

In determining whether a claimant under the age of eighteen is disabled, the ALJ undertakes a sequential three-step evaluation. 20 C.F.R. § 416.924(a). The first step is to inquire whether the claimant is engaged in substantial gainful activity. Id. The second step is to ascertain whether the impairment or combination of impairments is severe. Id. The third step is to determine whether the claimant has an impairment or impairments that meet, medically equal, or functionally equal a listed impairment. Id. A claimant will not be considered disabled unless he meets the requirements for each of these three steps. Id.

If a child has a severe impairment or combination of impairments that does not meet or medically equal any listing, the Commissioner will decide whether the plaintiff has limitations that "functionally equal the listings" of disabling conditions promulgated by the Commissioner. See 20 C.F.R. § 416.926a(a). To functionally equal the listings, the impairment or impairments must be of listing-level severity. Id. In other words, to be entitled to benefits, the claimant's impairments must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain of functioning. Id.; Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 665 (8th Cir. 2003).

There are six domains of functioning: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). A child has a marked limitation in a domain if the impairment "interferes seriously" with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2). An extreme limitation "interferes very seriously" with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3).

When evaluating a claimant's ability to function in each domain, the Commissioner asks for and considers information that will help to answer the following questions. What activities is the child able to perform? What activities is the child unable to perform? Which of the child's activities are limited or restricted compared to other age-equivalent children who do not have impairments? Where does the child have difficulty with activities - at home, in childcare, at school, or in the community? Does the child have difficulty independently initiating, sustaining, or completing activities? What kind of help does the child need to do activities, how much help is needed, and how often is it needed? 20 C.F.R. § 416.926a(b)(2)(i)-(vi).

These questions are not, singularly or as a whole, the only factors useful to determine whether or not a child has a "marked" or "extreme" limitation. 20 C.F.R. § 416.926a(e)(2), (4)(I). If applicable, test scores can be used in combination with other factors, observations, and evidence to determine the level of impairment. Id. "Marked" or "extreme" limitations as defined by test scores are not automatically conclusive if additional evidence in the record shows a pattern of behavior inconsistent with those scores. See 20 C.F.R. § 416.926a(e)(4).

## V. DISCUSSION

Plaintiff argues that the ALJ failed: (1) to properly consider all of plaintiff's severe medically determinable impairments, specifically, his borderline intellectual functioning (BIF) at Step Two; (2) to properly consider opinion evidence; and (3) to fully and fairly develop the arguments both for and against granting benefits.

**1.     Step Two Analysis**

Plaintiff argues that the ALJ failed to include BIF as a severe impairment at Step Two, removing it from the ALJ's subsequent RFC determination. This court disagrees.

Once an ALJ determines that a claimant has any severe impairment, she considers the cumulative effects of all plaintiff's severe and not severe impairments in evaluating functional equivalence at Step Three. See 20 C.F.R. § 416.926a(a). The ALJ in this case did just that, and therefore, her failure to find additional impairments severe is not reason to remand at Step Two.

Plaintiff also failed to establish that BIF was medically determinable in this case. A medically determinable impairment must be established by evidence from an acceptable medical source. 20 C.F.R. § 416.913(a). Plaintiff cites an IQ test from 2007, more than three years before the ALJ's decision. (Tr. 166, 170.) However, a child's IQ score of 40 or above is valid for only 2 years. See 20 C.F.R. pt. 404, subpt. P, app. 1, § 112(D)(10). Furthermore, an ALJ may reject IQ scores that are inconsistent with the record. See Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998). Here, the report citing the 2007 test described plaintiff's cognitive ability as "average to low average." (Tr. 166.) The ALJ in this case sufficiently considered the evidence concerning plaintiff's cognitive abilities at Step Three. (Tr. 17-20.) Therefore, the court concludes the ALJ did not err at Step Two.

**2.	Opinion Evidence**

Plaintiff argues that the ALJ incorrectly found "less than marked" limitations in the domain of acquiring and using information. This court concludes substantial evidence supports the ALJ's conclusion that plaintiff had some limitations in this domain, although not marked limitations.

The domain of acquiring and using information refers to how well a child learns and uses information. See 20 C.F.R. § 416.926a(g). Adolescents should be able to demonstrate what they have learned in academic assignments and to use what they have learned in daily living situations without assistance. See 20 C.F.R. § 416.926a(g)(v). Adolescents should also be able to express simple and complex ideas, use increasingly complex language, and apply these skills in practical ways that will help them enter the workplace after finishing school. (Id.)

The ALJ acknowledged that plaintiff's ability to learn and progress in school was impeded by his mental impairments, particularly his ADHD, that he required special education services, and that he performed academically below his grade level. She noted that plaintiff's intelligence and cognitive testing revealed a slower rate of learning, poor working memory, and poor ability in many aspects of language and speech. (Tr. 19-20.) Plaintiff's mother also testified at the hearing that plaintiff had difficulty remembering what he had read. (Tr. 40-41.)

The ALJ also considered, however, that testing demonstrated average to low average cognitive ability and that his treating psychiatrist, Dr. Viamontes, opined that plaintiff had unlimited ability to understand and carry out short, simple instructions, and limited but satisfactory ability to understand, remember, and carry out detailed instructions. Plaintiff's teacher, Ms. Schlote, opined that plaintiff had slight problems in some aspects of acquiring and using information, obvious problems in others, and a serious problem only with math. (Tr. 20, 150.) Plaintiff was promoted from the sixth to the seventh grade, and had not been required to repeat a grade since kindergarten. (Tr. 20.) Despite her subsequent testimony,

12

in a function report, plaintiff's mother alleged limitations in this domain, stating only that plaintiff had a "difficult time with reading comprehension." (Tr. 20, 142.) Cf. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) (fact that claimant did not allege depression in application for disability benefits is significant, even if the evidence of depression was later developed).

An ALJ will find that a child has a "marked" limitation in a domain when the child scores two standard deviations or more below the mean on a comprehensive standardized test and his day-to-day functioning is consistent with that score. 20 C.F.R. § 416.926a(e)(2). However, no single test score can by itself establish a marked limitation. 20 C.F.R. § 416.926a(e)(4)(I). Rather, test scores are considered together with other evidence in the record, including reports and observations of teachers and others. See 20 C.F.R. § 416.926a(e)(4)(ii). Plaintiff argues that the ALJ failed to explain why she found less than marked limitations despite evidence that plaintiff's reading level was two standard deviations below the mean. In support, plaintiff cites to objective test results from September and October 2009. However, few of these tests actually contained results more than two standard deviations below the mean. (Tr. 178, 184-85, 188.) It also appears that Dr. Mora relied on these test scores exclusively in assessing marked limitations. (Tr. 277.) Plaintiff also suggests that Mr. Davis's and Ms. Schlotes's indications that plaintiff read at a level at least two grades below his peers showed additional functioning two standard deviations below the mean. (Tr. 150, 226.) See id. Plaintiff cites no authority, however, to support the notion that a teacher's estimate of a student's grade level equates to a measure of standard deviation on a standardized test. See id. Furthermore, as noted above, the ALJ considered this evidence, but found that testing also indicated average or low average cognitive ability. (Tr. 19-20.)

The ALJ also found that plaintiff's academic performance had improved with therapy and increased medication, to the point that he began earning A's and B's in school. (Tr. 20, 232-33, 257-65.) The ALJ found that plaintiff's impairments had generally improved with

treatment throughout 2010, indicating that his impairments were no longer as severe as alleged. (Tr. 17.) See 20 C.F.R. §§ 416.926a(a)(3), 416.924a(b)(9); Collins ex rel. Williams v. Barnhart, 335 F.3d 726, 729-30 (8th Cir. 2002). Plaintiff contends that an increase in medication is necessarily inconsistent with improved behavior. However, the ALJ cited to evidence showing that medication in this case actually improved plaintiff's functioning. (Tr. 16-17.) Specifically, Dr. Viamontes assessed steadily increasing GAF scores throughout 2010. (Tr. 17, 350-61.) Plaintiff's teachers also noticed that by May 2010 plaintiff's emotions were stabilizing. (Tr. 17, 211.) Notes from plaintiff's treating physician, Dr. Matt, indicated that plaintiff's functioning and behavior had improved throughout 2010. (Tr. 17, 324-30.) Specifically, Dr. Matt noted that in December 2010 plaintiff displayed age-appropriate behavior, increased activity, and normal attention span and concentration. (Tr. 325.) Accordingly, the ALJ concluded that the evidence as a whole did not support a finding of marked limitations in the domain of acquiring and using information. (Tr. 19-20.)

Plaintiff also asserts that the evidence supports his alleged difficulties in the domain of attending and completing tasks. The ALJ, however, explicitly considered the evidence plaintiff cited in evaluating his complaints. (Tr. 17-18, 21.) The ALJ found that the opinions of Dr. Viamontes and Ms. Schlote supported a finding of less than marked limitations. (Tr. 21.) Indeed, Ms. Schlote opined that plaintiff displayed "no problem" or "a slight problem" in 7 out of 13 activities relating to this domain, a "serious" problem in none of these activities, and a "very serious problem" in one. (Tr. 151.) Dr. Viamontes found limited but satisfactory ability to maintain attention for two-hour segments, to complete a normal school day or week without interruption from symptoms, and to perform at a consistent pace without unreasonable breaks. (Tr. 21, 289.) This court therefore agrees with the ALJ's finding that the opinion and other evidence did not support a finding of marked limitations.

## 3. Opinion Evidence

Plaintiff next argues the ALJ failed to provide the weight given to the opinion of state agency non-examining medical consultant Dr. Mora. She argues that the ALJ failed to explain how Dr. Mora's opinion could support the ALJ's decision on the issue of whether plaintiff met or equaled a listed impairment, while at the same time not support her decision on the issue of whether plaintiff functionally equaled a listed impairment.

The ALJ considers opinion evidence together with the rest of the relevant evidence in determining disability. See 20 C.F.R. § 416.927; Social Security Ruling (SSR) 96-2p, 96-5p, 96-6p, 06-03p. When evaluating opinion evidence from acceptable medical sources and other sources, the ALJ considers factors such as: (1) how long the source has known and how frequently the source has seen the claimant; (2) how consistent the opinion is with the record as a whole; (3) how well the source supports and explains the opinion; and (4) whether the source has a specialty related to the claimant's impairments. See 20 C.F.R. § 416.927(c); SSR 06-03p. Not every factor applies in every case. SSR 06-03p.

In this case, the ALJ gave significant weight to the opinion of Dr. Viamontes, plaintiff's treating psychiatrist. (Tr. 17-18, 287-91.) The ALJ noted that by the end of 2010, Dr. Viamontes assessed GAF scores indicating mild symptoms. (Tr. 17, 350-61.) Plaintiff argues that Dr. Viamontes' opinion conflicts with the ALJ's finding of marked restriction in interacting and relating with others. However, the ALJ specifically relied on Dr. Viamontes's opinion in evaluating that domain. (Tr. 22.) Dr. Viamontes found limited but satisfactory ability to get along with peers and interact appropriately with others at school, and seriously limited but not precluded ability to work in coordination with others and maintain socially appropriate behavior. (Tr. 22, 290.) Furthermore, Dr. Viamontes found that plaintiff displayed anger, oppositional behavior, and difficulty behaving appropriately. (Tr. 22, 290.) The ALJ found these limitations consistent with a marked limitation in interacting and relating with others (Tr. 22.) Because the ALJ gave "good reasons" for the

15

weight she afforded the opinion of Dr. Viamontes, her evaluation of that opinion was sufficient. See 20 C.F.R. § 416.927(c)(2).

The ALJ assigned some weight to the opinion of Ms. Schlote, plaintiff's sixth-grade teacher. (Tr. 18, 149-56.) The opinions of "other" sources, such as teachers, cannot establish impairments but can be used to determine the effect of an impairment on the claimant's ability to function. See SSR 06-03p. Here, the ALJ considered that Ms. Schlotes's opinion was based on daily classroom interaction with plaintiff. (Tr. 18, 149). The ALJ also found Ms. Schlotes's opinion consistent with that of Dr. Viamontes, as well as other record evidence. (Tr. 18.) The ALJ relied on both opinions in determining that plaintiff had less than marked limitation in acquiring and using information and attending and completing tasks. (Tr. 17-18, 20-21, 150, 289.) Accordingly, the ALJ properly afforded some weight to Ms. Schlotes's opinion.

The ALJ assigned less weight to the opinion of Dr. Mora, the state agency non-examining medical consultant. (Tr. 18, 275-80.) Dr. Mora reviewed the record in March 2010 and opined that plaintiff's impairments did not meet, medically equal, or functionally equal the listings. (Tr. 275.) Dr. Mora assessed marked impairment in the domain of acquiring and using information, but no or less than marked limitation in the other five domains. (Tr. 18, 277-78.) As plaintiff acknowledges, Dr. Mora based her opinion regarding acquiring and using information on educational test results from 2009. (Tr. 277.) As discussed above, the ALJ, however, found subsequent evidence regarding plaintiff's improvement throughout 2010 particularly relevant. (Tr. 16-17.) The ALJ noted that unlike Dr. Viamontes and Ms. Schlote, Dr. Mora had not treated or interacted with plaintiff. (Tr. 18.) Thus, the ALJ properly assigned less weight to the opinion of Dr. Mora. See 20 C.F.R. §§ 416.927(c)(1), (6).

The ALJ also afforded little weight to the opinion of Mr. Davis, plaintiff's special education case manager who was also a non-medical "other" source. See SSR 06-03p. The ALJ found Mr. Davis's opinion inconsistent with the medical evidence, educational

evidence, function reports, and plaintiff's mother's testimony. (Tr. 18.) Specifically, the ALJ found that Mr. Davis assessed a more limited ability to communicate than indicated by other evidence. (Tr. 18, 141, 152-53, 167, 229-30.) In fact, plaintiff's IEP team opined that his communicative status was "adequate for school success." (Tr. 167.) Plaintiff contends that Mr. Davis's opinion was consistent with statements from plaintiff's mother. However, the ALJ found that plaintiff's mother testified to greater limitations than she alleged in earlier disability and function reports. (Tr. 17, 135, 141-42.) As the record evidence did not support any worsening of plaintiff's condition, the ALJ found the inconsistencies undermined plaintiff's mother's credibility. (Tr. 17.) Plaintiff contends that the ALJ should have resolved these inconsistencies in Mr. Davis' favor. However, resolving inconsistencies in the evidence is a task reserved to the ALJ. See Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006) (It is the ALJ's task to resolve conflicts in the evidence.). To the extent that plaintiff is suggesting that the ALJ might have weighed the evidence differently, he has not identified any error in the ALJ's analysis that requires remand. Thus, the ALJ's consideration of the opinion evidence will be affirmed.

Plaintiff finally argues that the ALJ failed to consider his functioning outside a structured and supportive school setting. However, the ALJ explicitly evaluated the "whole child," considering how plaintiff functioned "in all settings at all times." (Tr. 16.) The ALJ acknowledged that plaintiff received special education services, but noted that he could attend a regular classroom setting for 40 to 79% of the school day. (Tr. 19.) The ALJ also considered records concerning plaintiff's functioning, not only in special education classes, but during regular classes, at doctor visits, and at home. (Tr. 17-26.)

This court concludes that contrary to Plaintiff's various contentions, the ALJ considered all of the relevant evidence in finding that plaintiff did not have "marked" limitations in two functional domains or an "extreme" limitation in one functional domain.

## VI.  CONCLUSION

For the reasons set forth above, the court finds that the decision of the ALJ is supported by substantial evidence in the record as a whole and consistent with the Regulations and applicable law.  The decision of the Commissioner of Social Security is affirmed.  An appropriate Judgment Order is issued herewith.




                                             /S/   David D. Noce
                                    **UNITED STATES MAGISTRATE JUDGE**



Signed on   July 26, 2013.